## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## OXFORD DIVISION

---

**LEKEITRA BUCHANAN and JARVIS BUCHANAN, individually and on behalf of all others similarly situated,**

        **Plaintiff,**

**v.**

**AMERICAN STRATEGIC INSURANCE CORP.,**

        **Defendant.**

Civil Action No. <u>3:20cv106-DMB-RP</u>

**JURY DEMANDED**

---

## CLASS ACTION COMPLAINT

---

COME NOW Plaintiffs Lekeitra Buchanan and Jarvis Buchanan ("Buchanans" or "Plaintiffs"), individually and on behalf of all others similarly situated, and, pursuant to Federal Rule of Civil Procedure 8(a), state and allege the following for their Class Action Complaint against American Strategic Insurance Corp. ("American Strategic" or "Defendant"):

### PARTIES, RESIDENCY, JURISDICTION AND VENUE

1.      Plaintiffs Buchanans are citizens and residents of Olive Branch, Mississippi. At all times relevant hereto, the Buchanans owned a residential dwelling and other structures located at 10606 Three Wishes Drive, Olive Branch, Mississippi (collectively the "Structure").

2.      Defendant American Strategic is organized under the laws of the State of Florida with its principal place of business in St. Petersburg, Florida. American Strategic is authorized to sell property insurance policies in the State of Mississippi and is engaged in the insurance business in the State of Mississippi, including but not limited to DeSotoCounty.

3.      American Strategic has insurance agents in the Northern District of Mississippi for the conduct of its usual and customary business, including the sale of insurance policies to putative class members.

4.      American Strategic is a subsidiary of ARX Holding Corp. ("ARX"), which operates its affiliated subsidiary insurers under the name "The ASI Group."

5.      In turn, a controlling share of ARX is owned by The Progressive Corporation ("Progressive"), which controls The ASI Group insurers.  As a result, on policyholders' insurance policies and claims documents, Progressive sometimes describes American Strategic as "Progressive® Home" and American Strategic policyholders as "ASI/Progressive" policyholders.

6.      On information and belief, this Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA").

7.      This Court has personal jurisdiction over Plaintiffs and Defendant because Plaintiffs are residents and Defendant has availed itself of the privilege of conducting business and issuing insurance contracts covering structures in the State of Mississippi, including but not limited to DeSoto County.  Venue is proper in this district pursuant to, *inter alia*, 28 U.S.C. § 1391.

## FACTS

### A.  The Buchanans' Property Insurance Policy and Casualty Loss

8.      At all times relevant hereto, the Buchanans were insured pursuant to an insurance contract whereby American Strategic agreed to insure, *inter alia,* the Structure against property damage, bearing Policy No. MSA26984 (the "Policy").  As relevant hereto, the term of the Policy was October 15, 2019 to October 15, 2020.

9.      The Policy provided insurance coverage for sudden and accidental direct physical loss to the dwelling and other structures located on the insured premises, except as specifically excluded or limited by the Policy.

10.      This lawsuit only concerns property insurance coverage for buildings and structures, and *not* personal contents, such as clothes and furniture.

11.      Pursuant to the Policy, the Buchanans paid American Strategic an annual premium in exchange for insurance coverage.  The required premiums were paid at all times relevant to this Complaint.

12.      On or about January 11, 2020, the Structure located on the Insured Premises suffered sudden and accidental direct physical loss as a result of the storm that impacted the Olive Branch area on that date (the "Loss").

13.      The Policy was in effect at the time of the Loss, and the Loss is compensable under the terms of the Policy.  As it relates to the Loss, there is no applicable exclusion.

14.      The Buchanans notified American Strategic of the Loss and made a claim against the Policy.

15.      After its inspection, American Strategic determined that the Loss was covered by the terms of the Policy.

16.      American Strategic calculated its actual cash value ("ACV") payment obligations to the Buchanans by first estimating the cost to repair or replace the damage with new materials (replacement cost value, or "RCV"), and then subtracted depreciation.

17.      Certain policies of insurance issued by American Strategic in certain states expressly allow for the depreciation of "labor" as described herein.  This type of policy form or

endorsement will be referred to herein as a "labor depreciation permissive form." The Policy does not contain a labor depreciation permissive form.

**B. American Strategic's Calculation of the Buchanans' ACV Payment**

18.     In adjusting the Buchanans' claim, American Strategic affirmatively and unilaterally chose to exclusively use a "replacement cost less depreciation" methodology to calculate the losses and make its ACV payment to the Buchanans.

19.     American Strategic did not calculate any portion of the casualty loss by reference to or analysis of the alleged increases or decreases in the market value of its property, or the market value of any portion of its property. American Strategic did not conduct an appraisal of the market value of any portion of the Structure.

20.     American Strategic has waived, and is estopped from asserting, any right to contend that ACV should have been calculated under any methodology other than the methodology actually used by American Strategic, specifically including any market value methodology.

21.     American Strategic used commercially-available computer software to make its RCV, depreciation and ACV calculations. The software used to calculate the payments to the Buchanans is called Xactimate®.

22.     On or about February 26, 2020, American Strategic calculated the RCV of Buchanans' damaged structures at $16,153.18 (dwelling) and $6,492.06 (fencing) through Xactimate® price list MSS08X_JAN20.

23.     American Strategic then used the same Xactimate® program and price list to calculate the depreciation for damaged structures at $5,406.95 (dwelling) and $3,692.96 (fencing).

24.     A copy of American Strategic's estimate is attached hereto as **Exhibit "1"**.

25.     The Buchanans were underpaid and deprived of the use of their money from the time they should have received it until the date they recover the wrongfully withheld amounts, as more fully described below.

**C. The Advent Of: (1) The Insurance Industry's Withholding Labor As Depreciation From ACV Payments Under Computerized Claim Estimating Software Programs; And (2) The Creation Of "Labor Depreciation" Restricted Insurance Policy Coverage Forms**

26.     In this pleading, whenever reference is made to withholding "labor" as depreciation, "labor" means intangible non-materials, specifically including both the labor costs and the laborers' equipment costs necessary to restore Plaintiffs' property to its condition immediately prior to the loss, as well as "removal" costs to remove damaged property, as well as service taxes on the labor, under the software programs described below.

27.     Traditionally, and prior to the advent of the computerized property insurance claims estimating software programs described below, property insurance adjusters adjusting structural damage claims were taught only to depreciate materials, and not to withhold labor as "depreciation," when calculating ACV.  *See, e.g.*, Don Wood *et al.*, *Insurance Recovery After Hurricane Sandy: Correcting the Improper Depreciation of Intangibles Under Property Insurance Policies*, 42 TORTS, INS. & COMPENSATION L.J. 19, 24 (Winter 2013) ("I was taught many years ago that depreciation, when it was applied, must be done on a line-by-line, item-by-item basis…. I obtained charts of the average lifespans of materials.  A few sample pages from the National Association of Home Builders is attached.  Material lifespans shown in the attachment were derived from reports of product manufacturers.  Nowhere in any of the lists of materials is any labor item mentioned …"); Chip Merlin, *Few Judges and Insurance Regulators Worked In Property Claims: Understanding New Insurance Rulings*, PROP. INS. COV. LAW BLOG (August 16,

2017) ("when I was starting out, an older and experienced GAB [General Adjustment Bureau] adjuster told me they never depreciated labor").

28.     In contrast to the traditional property insurance industry approach, and in the past ten to fifteen years, commercially available claims estimating software programs began to provide a property insurer with the option to withhold a portion of the labor needed to repair a structure as "depreciation" at the same time the program calculated the depreciation arising from the physical deterioration of building materials.  This new option was created as property insurers, and their computer programmers, realized that withholding labor as "depreciation" could dramatically lower ACV payments.

29.     The computer programs that provide an insurance company with the option to withhold labor as depreciation include not only the software program used by Defendant—Xactimate, but also most of the prevalent claims estimating software programs used today. These claims estimating software programs all provide for the option of withholding of labor as depreciation by simply checking or unchecking a box with a computer mouse. For example, the below screenshot from the Xactimate program shows that an insurer can choose to select or de-select "Depreciate Non-Material" and "Depreciate Removal," both of which are labor items.



**Exhibit "2"** includes similar screenshots from the other primary valuation software platforms: Powerclaim®, Simsol®, and Symbility®.  Like Xactimate®, each allow the insurance company user the option to choose whether or not to depreciate labor costs.  In fact, Powerclaim® states

6

that "Tax and Labor can be optionally depreciated. Choose the appropriate setting for defaults." *Id*.

30.    Insurance companies such as Defendant generally issue company and state-wide directives, to all of their property adjusters, to either use or not use labor depreciation settings within a given jurisdiction when adjusting property claims.

31.    The claim estimating computer software program's option to withhold or not withhold labor as depreciation results in a tremendous difference between the amount a property insurer will pay for the ACV of identical claims.

32.    By 2008 at the latest, property insurers had two primary options with which to proceed concerning labor depreciation. On the one hand, property insurers could issue restricted insurance policy coverage forms ("labor depreciation permissive forms") to expressly allow for the new practice of withholding labor as depreciation.  Property insurers who chose this option had the obvious benefit of substantially lowering ACV claim payments, but risked losing market share based upon newly introduced coverage forms which restricted the amount of coverage provided and would appear to consumers to be weaker, less desirable insurance.

33.    Several property insurers operating in the states at issue have long chosen this path. For example, State Farm recently filed an endorsement with the Mississippi Department of Insurance that defined "actual cash value" and stated "labor … is subject to depreciation."

34.    This approach is mandated in the State of Mississippi, which requires that the practice of labor depreciation must be clearly delineated in the insurance policy if the insurer will engage in the practice.  Specifically, the Mississippi Insurance Commissioner issued a bulletin on August 4, 2017, which stated:

**MISSISSIPPI INSURANCE DEPARTMENT**
**BULLETIN 2017-8**

**DEPRECIATION OF LABOR EXPENSES IN PROPERTY LOSS CLAIMS**

It is the purpose of this Bulletin to provide the position of the Mississippi Insurance Department regarding the depreciation of labor expenses by an insurer in the adjustment of property loss claims.

There is no statutory law in Mississippi prohibiting the practice of labor depreciation in the adjustment of property loss claims. If such a practice is used, the insurer should clearly provide for the depreciation of labor in the insurance policy. Likewise, if material and/or labor depreciation is applied, the insurer should clearly set out any such depreciation on the claim estimate furnished by the insurer.

This Bulletin shall not apply to automobile physical damage claims.

**ISSUED** this the 4th day of August, 2017.



MIKE CHANEY
COMMISSIONER OF INSURANCE

35.     Despite this directive from Mississippi's highest-ranking insurance regulator, Defendant continued to withhold labor from actual cash value payments as depreciation without any disclosure of same in their policies or on the claim estimates provided to policyholders.

36.     In addition to Mississippi, the requirement that a property insurer issue a labor depreciation permissive form prior to engaging in the practice of withholding labor as depreciation is mandated by courts, *e.g.*, the States of Kentucky, Ohio and Tennessee.

37.     On the other hand, property insurers could also reject the new practice of withholding labor as depreciation from ACV payments. These carriers continue to pay ACV

claims at the traditional, but substantially higher rate. For example, the Nationwide Insurance Group does not withhold labor as depreciation from ACV payments.

38.     Unfortunately, certain property insurers, in an effort to obtain an advantage over their competitors and policyholders, rejected both of these approaches. These insurers chose not to risk their market share by creating and notifying policyholders, through restricted ACV coverage forms, that they would pay less for ACV payments. At the same time, these insurers began withholding labor as depreciation from ACV payments—without a change of policy forms and without informing policyholders. Defendant has taken this approach with respect to the claims at issue in this class action.

39.     Defendant's conduct was unfair to both its own policyholders and competing property insurers. Defendant's competitors: (1) continued to pay higher claims rates under policies similar to those used by Defendant; or (2) risked losing market share by creating and disclosing restricted policy forms notifying policyholders that they would begin to pay less for ACV claims. Defendant avoided both of these adverse consequences through its actions complained of herein.

40.     Instead, when calculating Plaintiffs and putative class members' ACV benefits owed under the respective policies, Defendant withheld certain costs of labor necessary to repair or replace its policyholders' properties under coverage forms that did not expressly permit the practice. Defendant depreciated costs associated with non-materials, *i.e.*, labor, throughout its ACV calculations.

41.     Defendant's withholding of labor costs associated with the repair or replacement of the insured properties resulted in Plaintiffs and putative class members receiving payment for their losses in an amount less than they were entitled to receive under policies that never included a form authorizing the practice.

**D.  Defendant's Practice of Labor Depreciation.**

42.     When it calculated Plaintiffs' ACV benefits owed under the Policy, Defendant withheld costs for both materials and the labor required to repair or replace Plaintiffs' property as depreciation, even though labor does not depreciate in value over time. Defendant withheld labor costs throughout its ACV calculations as depreciation.  Defendant also withheld labor costs as depreciation for other work necessary to repair and replace Plaintiffs' structures.

43.     Defendant's withholding of labor costs as depreciation associated with the repair or replacement of Plaintiffs' property resulted in Plaintiffs receiving payment for the loss in an amount less than Plaintiffs were entitled to receive under the applicable Policy. Defendant breached its obligations to Plaintiffs under its Policy by improperly withholding the cost of labor as depreciation.

44.     Plaintiffs themselves cannot determine the precise amount of labor that has been withheld based upon the written estimate provided.

45.     Plaintiffs concede that finished goods and construction materials can diminish in value over time due to use, wear, obsolescence, and age. Therefore, finished goods and construction materials depreciate. In contrast, both removal labor and installation labor are not susceptible to aging or wear. Their value does not diminish over time. Conceptually, practically, and under common understanding, depreciation cannot be applied to labor to remove damaged property or repair damaged property in the context of indemnification insurance.

46.     Labor, by its nature, does not depreciate, and an insurer therefore may not withhold labor as depreciation.  For example, materials used in the repair or replacement of a roof (roofing shingles) diminish in value over time due to the wear that age and use inflict on them.  In contrast,

labor is not susceptible to aging or wear, it does not lose value over time, and there is no depreciable life of labor. Labor's value does not diminish over time; only the materials depreciate.

47.     Defendant's practice of withholding labor costs as depreciation is inconsistent with the universally accepted premise that the fundamental purpose of property insurance is to provide indemnity to policyholders. To indemnify means to put the insured back in the position he or she enjoyed before the loss—no better and no worse. A policy, like Defendant's policies, that provides for payment of the ACV of a covered loss is an indemnity contract because the purpose of an ACV payment is to make the insured whole after the loss that occurred.

48.     While an insurer may lawfully depreciate material costs when calculating the amount of an ACV payment owed to an insured, it may not lawfully withhold repair labor or other non-materials as depreciation. Defendant's failure to pay the full cost of the labor necessary to return Plaintiffs back to their pre-loss condition left Plaintiffs under-indemnified and underpaid for the Loss.

49.     Defendant materially breached its duty to indemnify Plaintiffs by withholding labor and other non-materials costs associated with repairing or replacing Plaintiffs' property in its ACV payment as depreciation, thereby paying Plaintiffs less than they were entitled to receive under the terms of the Policy.

**E.  The Length of the Putative Class Period**

50.     Any affirmative defenses that may be pled seeking to limit the length of the putative class period are themselves subject to various judicial doctrines which can limit their application, including doctrines concerning the accrual of the members of the putative class's claims and their concealment.

11

51.     The maximum length of the putative class period is dependent upon, *inter alia*, the accrual of the causes of action for breach of contract, including but not limited to inherent discoverability of the breach.

52.     Defendant concealed its practice of withholding labor.  The practice of withholding labor as depreciation can be concealed by property insurers through manipulation of Xactimate software.  The practice of depreciating labor can also be concealed through misrepresentations in policyholder communications, marketing materials, and online information.  Ambiguities in policy language further the concealment as policy forms addressing labor depreciation have been used in the insurance industry for over a decade.

53.     Property insurance adjusters who work in the field: (a) often are unfamiliar with the concept of "labor depreciation;" (b) typically do not have the authority to change management's chosen depreciation option settings in Xactimate® if they do understand the concept; (c) are often unaware of their insurance company's required depreciation option settings that withhold labor because these are sometimes set by default within Xactimate®; (d) often do not understand that management is withholding labor as depreciation in only certain specified states; (e) often do not understand how Xactimate® software will withhold labor dependent upon the depreciation settings; and (f) often are not aware of the effect the Xactimate® depreciation option settings have on the value of ACV payments.  Without proper training and education, field adjusters are unable to properly communicate to insureds the effect of the practice, or even its existence.  Many Mississippi, Tennessee, Kentucky, and Ohio insurance adjusters do not even understand the concept.

54.     Property insurance policyholders are generally unfamiliar with the concept of withholding labor as depreciation from ACV payments.

12

55.    Most property insurance policyholders reasonably expect that they will be provided enough money to cover the labor costs to return their damaged property to the same condition it was in at the time of the loss, less their deductible, even if the insurance company takes a fair deduction for depreciation from the value of deteriorated building materials.  Policyholders would not reasonably understand that labor to repair a structure "depreciates."  Rather, policyholders can reasonably expect that depreciation will only be applied to tangible objects, like shingles or siding.

56.    As it relates specifically to estimates provided to Kentucky, Mississippi, Ohio and Tennessee policyholders, Defendant manipulated its Xactimate® computer software settings and claims communications to conceal its practice of withholding labor from its policyholders as described below.

57.    Specifically, Defendant did not depreciate labor when the Xactimate® line item only included labor.

58.    For one example, in the Buchanans' estimate (**Exhibit 1**), American Strategic did not depreciate the labor associated with the pure labor line items associated with removing or installing shingles on a steeper roof pitch (line-items 24 to 27).  The absence of depreciation for a line item is reflected in the column entitled "DEPREC," wherein the amount of depreciation is set at "(0.00)."  A policyholder is shown a depreciation amount of "0.00" associated with each of these pure labor line items (the "DEPREC." column).  This would lead a reasonable policyholder to believe that labor to install and remove roofing materials was not subject to depreciation.

59.    In contrast, line items 20 and 21 appear to describe only roofing materials, *i.e.*, "Laminated – comp. shingle rfg. w/out felt" and "Roofing felt."  These items have depreciation, listed as $3,340.98 and $634.00, respectively, in the DEPREC. column.  Again, based upon the absence of depreciation in labor line items and the existence of depreciation in material columns,

13

a policyholder is led to believe that only the shingles and roofing felt materials were being depreciated.

60.     However, surreptitiously and unbeknownst to any reasonable person, line items 20 and 21 do in fact withhold installation labor for installation of shingles and roofing materials as depreciation.

61.     In fact, in several line items that appear to describe materials in their titles, such as "Overhead door & hardware," "Vinyl window – double hung," "Window screen," "Gutter / downspout – aluminum," and "Shutters," labor is being withheld from policyholders such as Plaintiffs in addition to materials depreciation by the Xactimate® program.

62.     Throughout the estimate, and by design, when labor is isolated in a line item, no depreciation is taken by American Strategic, such as line items for steep roof charges (line items 24-27), detach and reset charges (line item 17), tear off and debris removal charges (line items 18, "other structures" line item 16).

63.     Because Defendant's estimate of Plaintiffs' Loss makes it appear that only line items with materials included in their description reflect depreciation while at the same time the pure labor line items do not reflect depreciation, it appears by all reasonable measures that Defendant was not depreciating labor when in fact it was.

64.     Applying depreciation in the following fashion is not based upon any sound or principled methodology for calculating depreciation.  Rather, it is intended to conceal the practice and deceive policyholders into believing the insurer is not depreciating labor.

65.     Forms specifically addressing labor depreciation have existed and been used in Kentucky, Mississippi, Ohio and Tennessee for many years.   Defendant inexplicably refused to

14

use such a form. At all times relevant hereto, Defendant's policies neither addressed nor called for removal or repair labor to be withheld as depreciation.

66. There are no marketing materials or online materials from Defendant alerting policyholders that Defendant will engage in this practice.

67. There are no standardized or form claim communications from Defendant explaining the practice of withholding labor as depreciation from ACV payments to consumers.

68. There are no required or suggested oral communications by Defendant's claims adjusters explaining the practice of withholding labor as depreciation from ACV payments to consumers.

69. Through all these means, Defendant takes affirmative actions to conceal the practice of labor depreciation withholding from consumers to reduce the likelihood of policyholder detection, and subsequent complaints, claims and lawsuits from policyholders. By doing so, Defendant can decrease the amounts paid to policyholders as actual cash value payments without detection, and reap a financial windfall by retaining funds that were due at the time of the actual cash value payment.

70. Defendant was in a superior position over policyholders to know that it was withholding labor through Xactimate®. Defendant controlled the settings for the software, which expressly permit a company to properly limit depreciation to materials only.

71. The practice was therefore not disclosed in the insurance policy, in the claim estimate, in the marketing materials, nor in the regulatory filings of Defendant. The affirmative steps Defendant took to conceal the cause of action for breach of the insurance contract were material facts that a reasonable person would have considered important in deciding whether to purchase insurance and/or accept ACV payments from Defendant.

72.    Defendant's practice of unlawfully withholding labor from Plaintiffs and putative class members' actual cash value payments could not have been discovered by a reasonable person of common knowledge and experience exercising reasonable diligence.

## AMOUNT IN CONTROVERSY

73.    Upon information and belief, the amount in controversy with respect to the proposed class exceeds $5,000,000, exclusive of interest and costs.

## CLASS ACTION ALLEGATIONS

74.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this lawsuit as a class action on behalf of themselves and on behalf of all others similarly situated. This action satisfies the requirements of numerosity, commonality, typicality, and adequacy of representation.  Only to the extent it is a requirement under applicable law, the proposed class herein is ascertainable.

75.    The proposed class that Plaintiffs seek to represent is defined as follows (the "Class"):

> All American Strategic policyholders who made: (1) a structural damage claim for property located in the states of Kentucky, Mississippi, Ohio or Tennessee; and (2) which resulted in an actual cash value payment during the class period from which "non-material depreciation" was withheld from the policyholder; or which should have resulted in an actual cash value payment but for the withholding of "non-material depreciation" causing the loss to drop below the applicable deductible.

> In this definition, "non-material depreciation" means application of either the "depreciate removal," "depreciate non-material" and/or "depreciate O&P" option settings within Xactimate® software or similar depreciation option settings in competing commercial software programs.

> The class period for the proposed class is the maximum time period as allowed by applicable law.

> The class excludes all claims arising under labor depreciation permissive policy forms, *i.e.*, those forms and endorsements expressly permitting the "depreciation" of "labor" within the text of the policy form. The class also excludes any claims in which the initial actual cash value payment exhausted the applicable limits of insurance.

76. Plaintiffs reserve their right to amend the definition of the proposed class through discovery. The following persons are expressly excluded from the class: (1) Defendant and its subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed Class; and (3) the Court to which this case is assigned and its staff.

77. Members of the putative class as defined all have Article III standing as all such persons and entities, at least initially, received lower claim payments than permitted under the policy. Certain amounts initially withheld as labor may be later repaid to policyholders upon further adjustment of the claim. However, policyholders who have been subsequently repaid for initially withheld labor still have incurred damages, at the least, in the form of the lost "time value" of money during the period of withholding, *i.e.*, interest on the amounts improperly withheld, for the time period of withholding.

78. The proposed class definition for Class, when referencing labor, includes all non-tangible depreciation of labor, including but not limited to, laborer's equipment or removal labor.

79. The members of the proposed class are so numerous that joinder of all members is impracticable. Plaintiffs reasonably believe that hundreds or thousands of people geographically dispersed across Kentucky, Mississippi, Ohio and Tennessee have been damaged by Defendant's actions. The names and addresses of the members of the proposed class are readily identifiable through records maintained by Defendant or from information readily available to Defendant.

80. The relatively small amounts of damage suffered by most members of the proposed class make filing separate lawsuits by individual members economically impracticable.

81. Defendant has acted on grounds generally applicable to the proposed class in that Defendant has routinely withheld labor costs as described herein in its adjustment of property damage claims under its policies of insurance. It is reasonable to expect that Defendant will continue to withhold labor to reduce the amount it pays to its insureds under these policies absent this lawsuit.

82. Common questions of law and fact exist as to all members of the proposed class and predominate over any questions affecting only individual members. The questions of law and fact common to the proposed class includes, but are not limited to:

    a. Whether Defendant's policy language is ambiguous concerning the withholding of labor costs in calculating ACV payments, and, if so, how Defendant's insurance policies should be interpreted;

    b. Whether Defendant's withholding of labor costs in its calculation of ACV payments breaches the insurance policies;

    c. Whether Defendant has a custom and practice of withholding labor costs in its calculation of ACV payments;

    d. Whether Plaintiffs and members of the proposed class have been damaged as a result of Defendant's withholding of labor costs in its calculation of ACV payments;

    e. Whether Plaintiffs and members of the proposed class are entitled to a declaration, as well as potential supplemental relief, under the Declaratory Judgment Act;

    f. Whether Plaintiffs and members of the proposed class are entitled to equitable relief in the form of specific performance, unjust enrichment, declaratory relief or restitutionary damages; and

83. Plaintiffs' claims are typical of the claims of the proposed class's members, as they are all similarly affected by Defendant's custom and practice concerning the withholding of labor. Further, Plaintiffs' claims are typical of the claims of the proposed class's members because their

claims arise from the same practices and course of conduct that give rise to the claims of the members of the proposed class and are based on the same factual and legal theories. Plaintiffs are not different in any material respect from any other member of the proposed class.

84.    Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the proposed class. Plaintiffs' interests do not conflict with the interests of the proposed class they seek to represent. Plaintiffs have retained lawyers who are competent and experienced in class action and insurance litigation. Plaintiffs and Plaintiffs' counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the members of the proposed class and will diligently discharge those duties by vigorously seeking the maximum possible recovery for the Class while recognizing the risks associated with litigation.

85.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Joining all proposed members of the proposed class in one action is impracticable and prosecuting individual actions is not feasible. The size of the individual claims is likely not large enough to justify filing a separate action for each claim. For many, if not most, members of the proposed class, a class action is the only procedural mechanism that will afford them an opportunity for legal redress and justice. Even if members of the proposed class had the resources to pursue individual litigation, that method would be unduly burdensome to the courts in which such cases would proceed. Individual litigation exacerbates the delay and increases the expense for all parties, as well as the court system. Individual litigation could result in inconsistent adjudications of common issues of law and fact.

86.    In contrast, a class action will minimize case management difficulties and provide multiple benefits to the litigating parties, including efficiency, economy of scale, unitary

adjudication with consistent results and equal protection of the rights of Plaintiffs and members of the proposed class. These benefits would result from the comprehensive and efficient supervision of the litigation by a single court.

87.     Questions of law or fact common to Plaintiffs and members of the proposed class, including those identified above, predominate over questions affecting only individual members (if any), and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Class action treatment will allow a large number of similarly situated consumers to prosecute their common claims in a single forum, simultaneously, efficiently, and without the necessary duplication of effort and expense that numerous individuals would require. Further, the monetary amounts due to many individual members of the proposed class are likely to be relatively small, and the burden and expense of individual litigation would make it difficult or impossible for individual members of the proposed class to seek and obtain relief.  On the other hand, a class action will serve important public interests by permitting consumers harmed by Defendant's unlawful practices to effectively pursue recovery of the sums owed to them, and by deterring further unlawful conduct.  The public interest in protecting the rights of consumers favors disposition of the controversy in the class action form.

88.     Class certification is further warranted because Defendant has acted or refused to act on grounds that apply generally to the class, so final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

89.     Plaintiffs may seek, in the alternative, certification of an issues class.

90.     Rule 23(c)(4) provides that an action may be brought or maintained as a class action with respect to particular issues when doing so would materially advance the litigation as a whole.

## COUNT I
## BREACH OF CONTRACT

91.     Plaintiffs restate and incorporate by reference all preceding allegations.

92.     Defendant entered into policies of insurance with Plaintiffs and members of the proposed class. These insurance policies govern the relationship between Defendant, Plaintiffs and members of the proposed class, as well as the manner in which claims for covered losses are handled.

93.     The policies of insurance between Defendant and Plaintiffs and the other members of the proposed class are binding contracts under Kentucky, Mississippi, Ohio and Tennessee law. The contracts are supported by valid consideration in the form of premium payments in exchange for insurance coverage.

94.     Defendant drafted the insurance policies at issue for the Plaintiffs and the proposed class members, which are essentially identical in all respects material to this litigation.

95.     In order to receive ACV claim payments, Plaintiffs complied with all material provisions and performed all of their respective duties with regard to their insurance policy.

96.     The policies of insurance Defendant issued to Plaintiffs and members of the proposed class state that, in the event of a loss, Defendant may fulfill its full or initial contractual obligation to an insured party by paying the ACV of the loss. At all times relevant hereto, Defendant's custom and practice has been, and is, to make such payments based upon Defendant's calculation of the ACV for the partial loss, less any applicable deductible.

97.     Defendant breached its contractual duty to pay Plaintiffs and members of the proposed class the ACV of their claims by unlawfully withholding labor costs as described herein.

98.     Defendant's actions in breaching its contractual obligations to Plaintiffs and members of the proposed class benefitted and continue to benefit Defendant. Likewise,

Defendant's actions damaged and continue to damage Plaintiffs and members of the proposed class.

99.     Defendant's actions in breaching its contractual obligations, as described herein, are the direct and proximate cause of damages to Plaintiffs and members of the proposed class.

100.     Additionally, Defendant breached the Policy by failing and refusing to promptly and fully pay the amounts individually owed to Plaintiffs as required by the terms of the Policies. As a result, Plaintiffs have been damaged in the amount of the unpaid portion of their loss, including but not limited to the property ACV of the damage to the Structure.  Defendant failed to pay Plaintiffs the full value of their claim unrelated to the depreciation of non-materials and labor when calculating its actual cash value obligations.  Defendant understated the scope of Plaintiffs' loss, omitted necessary items from its estimate, and failed to properly pay Plaintiffs for their losses. Plaintiffs complied with all material provisions and performed all of their respective duties with regard to their insurance policy. Plaintiffs are entitled to damages as a result of Defendant's breach of contract.

101.     In light of the foregoing, Plaintiffs and members of the proposed class are entitled to recover damages sufficient to make them whole for all amounts Defendant unlawfully withheld from their ACV payments.

102.     Plaintiffs and members of the proposed class seek any and all relief as may be permitted under Kentucky, Mississippi, Ohio and Tennessee law to remedy the ongoing breaches of contract.

**COUNT II**
**DECLARATORY JUDGMENT AND RELIEF**

103.     Plaintiffs restate and incorporate by reference all preceding allegations.

104.     This Court is empowered by the Declaratory Judgment Act as codified at 28 U.S.C.

§ 2201 and Federal Rule of Civil Procedure 57 to declare the rights and legal relations of parties regardless of whether further relief is or could be claimed.

105.    A party may seek to have insurance contracts, before or after a breach, construed to obtain a declaration of rights, status, and other legal relations thereunder adjudicated.

106.    Plaintiffs and members of the proposed class have complied with all relevant conditions precedent in their contracts.

107.    Plaintiffs seek, personally and on behalf of the proposed class, a declaration that Defendant's property insurance contracts prohibit the withholding of labor costs as described herein when adjusting losses under the methodology employed here.

108.    Plaintiffs further seek, personally and on behalf of the proposed class, any and all equitable relief available under the law that the Court deems necessary and proper to the administration of justice, including, but not limited to, identifying and locating policyholders, and notifying the same of the circumstances complained of and the restoration of their rights and remediation of their losses, and preclusion by Defendant in engaging in the conduct described herein, as may be permitted by law.

109.    Plaintiffs and members of the proposed class have suffered injuries.

**JURY DEMAND**

110.  Plaintiffs demand a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court:

1.      Enter an order certifying this action as a class action, appointing Plaintiffs as the representatives of proposed class, and appointing Plaintiffs' attorneys as counsel for the class;

2.      Enter a declaratory judgment, declaring that Defendant's labor depreciation as further alleged herein is contrary to and breaches the insurance policies issued to Plaintiffs and members of the class;

3.      Enter a preliminary and permanent injunction and equitable relief against Defendant and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the policies, practices, customs, and usages complained of herein;

4.      Enter an order that Defendant specifically perform and carry out policies, practices, and programs that remediate and eradicate the effects of its past and present practices complained of herein;

5.       Award compensatory damages for all sums withheld as labor costs under the policy, plus prejudgment interest on all such sums, to Plaintiffs and members of the proposed class;

6.      Award compensatory damages to Plaintiffs and members of the proposed class for all amounts to which they are entitled pursuant to the Policies as described herein;

7.      Award compensatory damages to Plaintiffs for all amounts to which they are individually entitled pursuant to the Policy as a result of the Loss;

8.      Award costs, expenses, and disbursements incurred herein by Plaintiffs and members of the proposed class;

9.      Pre- and Post-Judgment interest; and

10.      Grant such further and additional relief as the Court deems necessary and proper.

McWHERTER SCOTT BOBBITT PLC


/s/  J.Brandon McWherter_____
J. BRANDON McWHERTER – MS Bar #105244
341 Cool Springs Blvd, Suite 230
Franklin, TN  37067
(615) 354-1144
brandon@msb.law

ERIK D. PETERSON (KY Bar 93003)*
MEHR, FAIRBANKS & PETERSON
 TRIAL LAWYERS, PLLC
201 West Short Street, Suite 800
Lexington, KY 40507
(859) 225-3731
edp@austinmehr.com

T. JOSEPH SNODGRASS (MN Bar 0231071)*
LARSON· KING, LLP
30 7th Street E., Suite 800
St. Paul, MN 55101
(651) 312-6510
jsnodgrass@larsonking.com

*Attorneys for Plaintiffs and
Proposed Class Representative*

*\* to be admitted pro hac vice*